An unpublished order shall not be regarded as precedent and shall not be cited as legal authority. SCR 123.

IN THE SUPREME COURT OF THE STATE OF NEVADA

|  |  |
|---|---|
| DEPARTMENT OF HEALTH AND HUMAN SERVICES, AGING AND DISABILITY SERVICES DIVISION, Appellant, vs. PUBLIC UTILITIES COMMISSION OF NEVADA, Respondent. | No. 64474 |

**FILED**

MAY 29 2015

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY S. Young
DEPUTY CLERK

*ORDER OF REVERSAL AND REMAND*

This is an appeal from a district court order denying a petition for judicial review of a final decision made by respondent Public Utilities Commission of Nevada (PUC). First Judicial District Court, Carson City; James E. Wilson, Judge.

Appellant Nevada Department of Health and Human Services, Aging and Disability Services Division (ADSD), contends that the PUC erred when it altered the budget for deaf-and-hard-of-hearing centers that the ADSD submitted to the PUC (ADSD's budget) to exclude the funding of services without a nexus to telecommunication devices and the dual-relay system.[1] The ADSD argues that in so doing, the PUC prejudiced the ADSD's substantial rights by (1) exceeding the PUC's statutory authority, or (2) making a decision that was affected by an error of law. For the

---

[1] The dissent contends that the PUC only acted to "set[ ] the telecommunication device for the deaf surcharge rate per access line for telecommunication customers in Nevada." We note that where the PUC went line-by-line through the ADSD's budget to determine the amount that the ADSD could allocate to such things as turning a staff interpreter position from part-time to full-time and to the advertising of its annual budget, the PUC's conduct was not so constrained.

SUPREME COURT
OF
NEVADA

(O) 1947A

15-16446

reasons stated below, we conclude that the PUC misinterpreted NRS 427A.797 when it altered the ADSD's budget and therefore exceeded its statutory authority.

In reviewing the PUC's final decision, our role is identical to that of the district court. *Nev. Power Co. v. Pub. Utils. Comm'n of Nev.*, 122 Nev. 821, 834, 138 P.3d 486, 495 (2006). Thus, we

> may affirm the decision of the [PUC] or set it aside in whole or in part if substantial rights of the petitioner have been prejudiced because the final decision of the Commission is:
>
> (a) In violation of constitutional or statutory provisions;
>
> (b) In excess of the statutory authority of the Commission.

NRS 703.373(11); *see also Nev. Power Co.*, 122 Nev. at 834, 138 P.3d at 495.

*The ADSD is not limited in using the surcharge money at the deaf-and-hard-of-hearing centers to funding services with a nexus to telecommunication devices and the dual-relay system*

The PUC's interpretation of NRS 427A.797 is an issue of law that we review de novo. *Nev. Power Co.*, 122 Nev. at 834, 138 P.3d at 495. We interpret unambiguous statutes based on their plain meaning. *D.R. Horton, Inc. v. Eighth Judicial Dist. Court*, 123 Nev. 468, 476, 168 P.3d 731, 737 (2007). "A statute is ambiguous if it is capable of being understood in two or more senses by reasonably well-informed persons." *Id.*

As an initial matter, we address whether the surcharge money may only be used to fund services with a nexus to telecommunication devices and the dual-relay system. Here, the statutory scheme is helpful. *See In re CityCenter Constr. & Lien Master Litig.*, 129 Nev. ___, ___, 310

P.3d 574, 580-81 (2013) (interpreting a statute by looking to a related statute and construing them harmoniously); *Hernandez v. Bennett-Haron*, 128 Nev. ___, ___, 287 P.3d 305, 315 (2012) (identifying ambiguity as a justification for looking beyond the statute at issue and referencing the statutory scheme).

The Legislature directed that the provisions of NRS Chapter 427A are to be *"liberally* construed to effect its stated purposes." NRS 427A.030 (emphasis added). The Legislature expressly stated its intent to serve the holistic needs and interests of people with disabilities, including people with impaired hearing. NRS 427A.010. The statute provides, in pertinent part, that the State, "within the limits of available resources," shall help people with disabilities

> secure equal opportunity to the full and free enjoyment of and access to:
>
> (a) Full participation in the social and economic life of the State;
>
> (b) Opportunities for remunerative employment;
>
> . . .
>
> (d) Freedom and independence in planning and managing their lives, including, without limitation, the ability to exercise individual initiative;
>
> . . .
>
> (f) The best possible physical and mental health, without regard to economic status;
>
> (g) Necessary health, personal assistance and independent living services that are designed to enable persons with disabilities to avoid receiving institutional care, or to transition from an institutional setting back to their communities;

> (h) Respite for family members of persons with disabilities from their duties as primary caregivers; and

> (i) Meaningful participation in a wide range of civic, cultural and recreational opportunities.

NRS 427A.010(2). Inasmuch as NRS 427A.797 is unclear regarding the specific services that the deaf-and-hard-of-hearing centers may provide and what must be funded by the surcharge money, the statutory scheme and its stated purpose offers a reliable basis for concluding that the Legislature intended something broader than what the PUC purports. Thus, we hold that the surcharge may fund services at the centers that serve the various interests in NRS 427A.010.

*The PUC lacks authority to determine ADSD's budget*

The first provision of NRS 427A.797 (the "program provision") requires the ADSD to create and manage a program that helps people with impaired speech or hearing obtain and use telecommunication devices or a "dual party-relay system." NRS 427A.797(1). While the program provision tasks the ADSD with creating and managing the program, it also requires the program to be "approved by the [PUC]." *Id.*

The second provision of NRS 427A.797 (the "surcharge provision") requires "the Commission" to establish a surcharge amount that customers of telephone companies must pay. NRS 427A.797(2). The amount of the surcharge must be enough to (1) finance the program concerning telecommunication devices and the dual-relay system that the ADSD creates and manages, (2) "[f]und the centers for persons who are deaf or hard of hearing operated by this State," and (3) cover a portion of costs that the ADSD incurs in carrying out the provisions of a statutory scheme regarding regulation of interpreters and realtime captioning providers. *Id.*

The third provision of NRS 427A.797 (the "account provision"), creates an "Account for Services for Persons With Impaired Speech or Hearing" that the ADSD administers. NRS 427A.797(3). The money that the ADSD obtains pursuant to the surcharge provision is credited to this account, which can be used for enumerated purposes, including:

> (d) For the general administration of the program developed and administered pursuant to [the program provision];
>
> . . . .
>
> (f) To fund the centers for persons who are deaf or hard of hearing operated by this State[.]

*Id.*

Thus, in both the surcharge provision and the account provision, the Legislature identified funding for the program that concerns telecommunication devices and the dual-relay system separately from funding for the deaf-and-hard-of-hearing centers. Given that the Legislature, on two occasions, listed the telecommunication device/dual-relay system program separately from the deaf-and-hard-of-hearing centers, and since the Legislature did not mention the centers when defining the telecommunication device/dual-relay system program, we find that the centers are distinct from the program and its purpose.

The language in NRS 427A.797 does not authorize the PUC to alter the ADSD's budget. The program provision permits the PUC to approve or disapprove of the program concerning telecommunication devices and the dual-relay system. NRS 427A.797(1). The surcharge provision permits the PUC to "establish by regulation" the amount of the surcharge that must be "sufficient to . . . [c]over the costs of the program," which provides telecommunication devices and the dual-relay system, and to fund the deaf-and-hard-of-hearing centers. NRS 427A.797(2).

Therefore, at most, the PUC can approve or disapprove of the program concerning telecommunication devices and the dual-relay system and set a surcharge rate to finance that program and the deaf-and-hard-of-hearing centers. *See* NRS 427A.797.

However, that is not to say that the PUC must set the surcharge rate at whatever level the ADSD requests. The PUC is still bound by NRS 704.001(4), which requires the PUC to provide customers with just and reasonable utility rates. Thus, while the PUC cannot approve or disapprove of funding for individual budget items of the ADSD, it may find that the overall amount requested by the ADSD leads to an unjust or unreasonable surcharge rate for customers, and it may adjust the surcharge rate accordingly. *See Nevada Power Co. v. Eighth Judicial Dist. Court*, 120 Nev. 948, 957, 102 P.3d 578, 584 (2004) (holding that "[t]he only limit on the PUC's authority to regulate utility rates is the legislative directive that rates charged for services provided by a public utility must be 'just and reasonable' and that it is unlawful for a public utility to charge an unjust or unreasonable rate" (citation omitted)).[2]

---

[2]The dissent uses this "just and reasonable" requirement to argue that "all approved rates reflect to some degree the costs actually caused by the customer who must pay them," *K N Energy, Inc. v. Fed. Energy Regulatory Comm'n*, 968 F.2d 1295, 1300 (D.C. Cir. 1992), and thus the ADSD should be limited in using the surcharge money at the deaf-and-hard-of-hearing centers to fund services with a nexus to telecommunication devices and the dual-relay system. The caselaw used by the dissent to support this contention, however, concerns discretionary rate setting by public utilities, *id.* at 1296; *see also Sithe/Independence Power Partners, L.P. v. Fed. Energy Regulatory Comm'n*, 285 F.3d 1, 1-3 (D.C. Cir. 2002); *Illinois Commerce Comm'n v. Fed. Energy Regulatory Comm'n*, 721 F.3d 764, 769-72 (7th Cir. 2013), *cert. denied sub nom. Schuette v. Fed. Energy Regulatory Comm'n*, 571 U.S. ___, 134 S. Ct. 1277

*continued on next page...*

*Conclusion*

We hold that the PUC misinterpreted NRS 427A.797 and, thus exceeded its statutory authority when it altered the ADSD's budget. As a result, the PUC prejudiced the ADSD's substantial rights because it precluded the ADSD from exercising authority that it possessed. Therefore, we

ORDER the judgment of the district court REVERSED and REMAND this matter to the district court for proceedings consistent with this order.

_____, J.
Parraguirre

_____, J.
Saitta


PICKERING, J., dissenting:

The majority identifies the question on appeal as being whether the PUC exceeded its statutory authority by "alter[ing] the ADSD's budget." Majority at 1. In actuality, the conduct by the PUC in question intrudes less into the ADSD's domain than the majority's

---

*...continued*
(2014), *and cert. denied sub nom. Hoosier Energy Rural Elec. Coop., Inc. v. Fed. Energy Regulatory Comm'n*, 571 U.S. ___, 134 S. Ct. 1278 (2014), not legislatively mandated surcharges for the purpose of funding services for the deaf and hard of hearing, as in the present case.

characterization of the circumstances suggests, inasmuch as the PUC only acted to "set[ ] the telecommunication device for the deaf surcharge rate per access line for telecommunication customers in Nevada" by refusing to fund items in the ADSD's budget that lacked a nexus to telecommunication devices for the deaf. Thus, the central issue raised here is more properly framed as the extent to which an executive agency like the ADSD, which has neither democratic accountability nor that which exists between a utility provider and customer, can demand that the PUC impose a surcharge for services entirely divorced from those services that the PUC is tasked with regulating, and can do so without allowing the PUC meaningful oversight authority—that is, what limits exist as to the scope of services a utility's customer can be expected to fund through his or her payments to said utility?

Based on the Legislature's statement that the provisions of NRS Chapter 427 are to be "liberally construed," the majority lays out the astonishing proposition that "[t]he ADSD is not limited in using the [PUC's] surcharge money . . . to fund[ ] services with a nexus to" the utility services that the PUC regulates. Majority at 2. This, then, is the world which the majority envisions—if the Legislature has instructed that a law imposing a surcharge be broadly interpreted to ensure its purposes are fulfilled, those who pay the bills upon which said surcharge is imposed may permissibly be required to subsidize every socially desirable but otherwise unfunded spending program through that surcharge; a legislatively imposed surcharge upon internet users to fund the purchase of laptops for disadvantaged youth, for instance, could be extended by an interpreting executive agency to fund public schools generally, simply because the extension of that surcharge would be consistent with the

Legislature's purpose of improving educational opportunities for low-income students, and the Legislature had instructed that the surcharge provision be read "liberally." Even setting common-sense objections aside, this ideation is simply incorrect. The Legislature's instruction that certain laws be liberally construed is merely linguistic—it mandates this court's generosity in its interpretation of statutory language, not in the doling out of surcharge funds to deserving programs—and therefore its scope is constrained by the actual textual limits of the relevant statutes. In the instant case, it is NRS 704.001(4), which requires that any utility charges imposed by the PUC be "just and reasonable," that ought to constrain our interpretation of NRS 427A.797.

In the context of federal law, particularly the federal Natural Gas Act and Federal Power Act, utility charges are limited—as they are in Nevada—to those which are "just and reasonable," and, as derived from this limitation, the concept of "cost-causation" sets the outward bounds of service costs that may be imposed on utility customers. *See K N Energy, Inc. v. F.E.R.C.*, 968 F.2d 1295, 1300 (D.C. Cir. 1992); *Sithe/Independence Power Partners, L.P. v. F.E.R.C.*, 285 F.3d 1, 5 (D.C. Cir. 2002); *Illinois Commerce Comm'n v. F.E.R.C.*, 721 F.3d 764, 770-71 (7th Cir. 2013), *cert. denied sub nom. Schuette v. F.E.R.C.*, 134 S. Ct. 1277 (2014), *and cert. denied sub nom. Hoosier Energy Rural Elec. Co-op., Inc. v. F.E.R.C.*, 134 S. Ct. 1278 (2014). This cost-causation principle provides that, "all approved rates must reflect to some degree the costs actually caused by the customer who must pay them"; or, put in the majority's terms, there must exist a direct nexus between the benefit the customer draws from a utility and the charges assessed against that customer. *Illinois Commerce Comm'n*, 721 F.3d at 770; *see* Majority at 1-2 & n.1. The majority admits

SUPREME COURT
OF
NEVADA

(O) 1947A

9

that it is "unlawful for a public utility to charge an unjust or unreasonable rate" given NRS 704.001(4), but denies that cost-causation has any bearing on the determination, providing no alternative and instead attempting to elide the question of what categories of charges a utility may justly and reasonably impose on its customers via surcharge. Majority at 6-7.

But, if neither cost-causation nor any similar nexus is required to render a surcharge "just and reasonable," and if instead a "liberal" reading of NRS 427A.797 tasks the PUC legislatively with using its rate-setting authority to underwrite social programs completely untethered from its utility services, a real question exists as to the section's constitutionality. Under such an interpretation, NRS 427A.797's surcharge provision would essentially be an "enforced contribution to raise revenue" instead of one created "to reimburse the state for special services rendered to a given party." *Starr v. Governor*, 802 A.2d 1227, 1229 (N.H. 2002). And, despite its official title, the contribution mandated by NRS 427A.797's surcharge provision would therefore be not a surcharge, but a tax. *Starr*, 802 A.2d at 1229; *see also Cumberland Farms, Inc. v. Tax Assessor, State of Me.*, 116 F.3d 943, 946 (1st Cir. 1997) (the imposition of a "tax-like" surcharge is taxation). Generally speaking, because "[t]he only security against the abuse of [the taxation] power, is found in the structure of the government itself," *M'Culloch v. State*, 17 U.S. 316, 428 (1819), a legislature may not, constitutionally, delegate its power to tax to another branch of government unless the individual state's constitution otherwise provides, *see, e.g., Schultes v. Eberly*, 2 So. 345, 346 (Ala. 1887); *Stewart v. Daytona & New Smyrna Inlet Dist.*, 114 So. 545, 547 (Fla. 1927); *State ex rel. Howe v. City of Des Moines*, 72 N.W. 639, 643 (Iowa

1897); *Mouledoux v. Maestri*, 2 So. 2d 11, 15 (La. 1941) (power to tax can be delegated but not surrendered based on constitutional language); *Scott v. Donnelly*, 133 N.W.2d 418, 424 (N.D. 1965); *Multnomah Cnty. v. Luihn*, 178 P.2d 159, 165 (Or. 1947); *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 291 (Pa. 1975); *State ex rel. Field v. Smith*, 49 S.W.2d 74, 79 (Mo. 1932); *see also* 84 John Bourdeau, et al., *C.J.S. Taxation* § 14 (2014) (collecting cases), which Nevada's does not. *See* Nev. Const. art. IX, § 2(1); Nev. Const. art. X, §1(1) (tasking the Legislature with imposing any necessary tax). We should therefore endeavor to avoid propounding such an interpretation of the section, *Ford v. State*, 127 Nev. ___, ___, 262 P.3d 1123, 1130 (2011) (stating that an interpretation of a statute that casts it into constitutional doubt should be eschewed), especially given that the Legislature's inclusion of the "just and reasonable" statutory limitation makes it entirely unlikely that it intended to affect such an unconstitutional delegation.

Thus, I cannot accept that the PUC was required to "set a surcharge rate to finance . . . the deaf-and-hard-of-hearing centers" despite that many items in the centers' budgets—which, between 2011 and 2013, included "trainings addressing domestic violence, child welfare, and human trafficking issues, workshops addressing credit history, identity theft, and tax issues, job coaching, mental health counseling, workshops addressing breast cancer, diabetes, and hepatitis issues; cooking classes; gingerbread house making classes; jeopardy games; bowling outings; seminars on how to play poker; summer camps; and grant writing courses," among other activities—were entirely divorced from any utility service provided by the PUC. As demonstrated, if the PUC determined that the surcharge required to fund the centers was unreasonable or

unjust for the absence of any connection between the services funded and the services that the PUC provides, it was legally obliged to adjust the surcharge. To the extent that the majority has held otherwise, thereby granting the Legislature unsought power to fund via utility surcharges as set by an administrative agency, social programs unrelated to the services that the utility provides, this court has announced a proposition so extraordinary that it surely ought to have done so in a published disposition.

For these reasons, I respectfully dissent.

*Pickering* , J.
Pickering, J.

cc: Hon. James E. Wilson, District Judge
Robert L. Eisenberg, Settlement Judge
Attorney General/Carson City
Attorney General/Las Vegas
Public Utilities Commission of Nevada
Carson City Clerk