NEVADA POWER COMPANY, a Nevada Corporation, Appellant, *v.* THE PUBLIC SERVICE COMMIS-SION, an Administrative Agency of the State of Nevada; NOEL A. CLARK, Chairman; EVO A. GRA-NATA and HEBER P. HARDY, as members of said Commission, Respondents.

No. 8013

December 30, 1975                    544 P.2d 428

*Beckley, Singleton, DeLanoy & Jemison, Chartered,* Las Vegas, for Appellant.

*Robert List,* Attorney General, and *Robert L. Crowell,* Deputy Attorney General, Carson City, for Respondents.

## OPINION

By the Court, MOWBRAY, J.:

This is an appeal from an order of the district court affirming an order of the respondent, Public Service Commission, regarding seven rate increase applications filed by the appellant, Nevada Power Company.

Company filed applications for seven rate increases with Commission between September 12 and November 7, 1973. On November 8, 1973, Commission consolidated the seven applications into one proceeding, which was duly noticed to the public. Hearings on the applications commenced December 4, 1973. They were continued by announcement thereat and were heard December 18–21, 1973, and on March 6, 1974. Commission filed its order on March 11, 1974. Company sought judicial review in the district court under the provisions of NRS 704.540. The court below, after reviewing the evidence presented to Commission, held that Commission had not abused its discretion by acting arbitrarily or capriciously, and the court affirmed Commission's order in all respects.

Company has appealed, claiming that Commission did abuse its discretion in rejecting certain evidence relating to its operational costs and further that Commission acted arbitrarily in setting a rate of return on its common equity of 12.75%, which Company claims its confiscatory.

When an order of an administrative board is challenged, the function of this court is the same as that of the district court. We must review the proceedings before Commission and determine whether that body abused its discretion. Southwest Gas Corp. v. Public Serv. Comm'n, 86 Nev. 662, 474 P.2d 379 (1970); Urban Renewal Agency v. Iacometti, 79 Nev. 113, 379 P.2d 466 (1963); McKenzie v. Shelly, 77 Nev. 237, 362 P.2d 268 (1961). We have made such a review of the proceedings before Commission, and we find and so hold that Commission did not abuse its discretion, and we therefore, as did the district court below, affirm Commission's order of March 11, 1974, in all respects.

1. The seven applications filed by Company and noticed to the public were predicated for the most part on an increased cost of fuel.[1]

The evidence presented to support these applications was based on Company test year ending May 31, 1973. However, at the hearings on the seven applications commencing on December 4, 1973, Company attempted to support the rate increase by using a new Company test year ending September 30, 1973. This test year contained numerous items that were not considered in or noticed when the seven original applications were filed.[2]

---

[1]Company filed rate applications designated as Docket Nos. I&S 810, 811, 820, 823, 824, 826, and 827.

Applications I&S 810 and 811, filed September 12, 1973, state that they were necessitated by ". . . the severe curtailment of natural gas .,. . and the resultant requirement of high cost fuel oil that will have to be purchased to substitute for this gas . . ."

Applications I&S 823 and 824, filed October 19, 1973, state they were necessitated by ". . . the sharp increase in the cost of natural gas and the sharp increase in the cost of low sulphur fuel oil for the Sunrise and Clark Generating stations . . ."

Applications I&S 826 and 827, filed November 7, 1973, state they were necessitated by ". . . the increased cost of common equity capital and increase in oil prices . . ."

Application I&S 820, filed October 5, 1973, requested review of specific customer service charges.

[2]For instance, the test year ending September 30, 1973, contained the following new costs not previously submitted or noticed to the public:
1. Effluent lines, $72,002.
2. Increased wage costs, $198,216.
3. Research and development costs, $56,000.
4. Additional rate base items, $8,119,379.
5. Rate at which allowances for funds used during construction may be capitalized.

It is Company's principal argument on this appeal that Commission erred in not considering the additional costs reflected in the new test year ending September 30, 1973. Commission felt otherwise and so expressed itself in its written order of March 11, 1974, when it said, in part:

". . . [A] person examining these applications should be able to rely on the factors stated by the Applicant in its applications as justifying the rate increases. Therefore, were the Commission to hear and issue orders on matters not submitted by the Applicant in its application, there would to that extent be a denial of fairness and due process through inadequate Notice."[3]

We agree, as did the district court, with the conclusions of the Commission. In the State of Nevada, the public has a statutory right to both notice of a utility's rate increase application, including its contents, and notice of a Commission hearing on any such rate application. Additionally, a member of the public is entitled to participate in rate application hearings either as an intervenor or as an interested party.

1. Notice of Hearing and Right to Be Heard.

Company argues that Commission exercises a legislative function and does not in so doing adjudicate vested interests

---

6. Oil tanks in rate base, $513,241.
7. Borrowed energy costs, $191,250.
8. Interchange transactions, $319,695.

[3]Commission's order of March 11, 1974, stated in part:

"Two problems arise. In the first instance, Section 704.100 of the Nevada Revised Statutes provides that no change in Applicant's rates, rules and regulations can be effected on less than 30 days' notice to the Commission. This notice provision is not complied with when, as was done in the instant case, Applicant proceeds to propose, at the hearing, rates different and higher than those originally applied for and noticed.

"Next, Section 704.110(1) of the Nevada Revised Statutes provides that upon filing of any new rate, rule or regulation the Commission is authorized 'upon reasonable notice, to enter upon a hearing concerning the propriety of such rate, fare, charge, classification, regulation, discontinuance, modification, restriction or practice'. In this case the Commission gave notice of a hearing to be held concerning the instant applications as they were filed. This notice provided that interested persons could examine these applications as filed and determine for themselves whether they wished to make an appearance to contest the 'propriety' of the requested rate increase. In making such a determination a person examining these applications should be able to rely on the factors stated by the Applicant in its applications as justifying the rate increases. Therefore, were the Commission to hear and issue orders on matters not submitted by the Applicant in its application, there would to that extent be a denial of fairness and due process through inadequate Notice."

requiring a public hearing for affected ratepayers. While it may be argued that a ratepayer does not have a constitutional right to due process in a legislative rate making procedure, it is clear that in the State of Nevada the public, who is served by the utility, has a statutory right to both notice of a utility's rate increase application, including its contents, and notice of a Commission hearing on any such rate application.

A utility operating under the regulatory jurisdiction of Commission may not effect a change in its rates for service upon less than 30 days' notice to Commission. NRS 704.100(1). Moreover, a utility is required under NRS 704.100(2) to file and post its new or amended rates in its stations and offices.

Pursuant to NRS 703.170 and NRS 704.210(1), Commission on July 1, 1961, adopted its Rules of Practice and Procedure before the Public Service Commission of Nevada. Rule 15.2 of the Rules states as follows:

"If applicant for authorization to increase rates is a gas, electric, telephone, or water utility, or a street railroad corporation or a passenger stage corporation, the applicant shall name in the application and mail a copy therof to the state, when the state is a customer or subscriber whose rates would be affected by the proposed increase in rates, and to the counties, or the municipal corporations whose citizens would be affected by the proposed increase in rates, and shall name any other parties to whom copies of the application will be mailed and applicant shall promptly notify the Commission of such mailing, unless otherwise ordered by the Commission. Applicant shall also mail copies to such additional parties and within such times as may be designated by the Commission."

Similarly, the public is entitled to notice of a Commission hearing on a rate application pursuant to Rule 9.2 of the Rules, which states that "[a]ll hearings required by the Public Service Commission of Nevada must be noticed by publication and mailing." Rule 9.2 further states: "Copies of the notice shall also be mailed to all city clerks and county clerks of each county or city wherein patrons or customers affected by the application reside, and such other parties as designated by the Commission."

Members of the public may participate in a hearing pursuant to Rule 4.1, which states:

"At any hearing, all parties named in the preceding rule, except interested parties, shall be entitled to enter an appearance, to introduce evidence, examine and cross-examine witnesses, make arguments, and generally participate in the conduct of the proceeding. Interested parties who are or may

be directly and substantially affected by the proceeding may enter an appearance, introduce evidence and, subject to the discretion of the Commission, may otherwise participate in the conduct of the proceeding."

Under statutory language almost identical to the Nevada statute, a Delaware court held in Smith v. Delaware Coach Co., 70 A.2d 257, 260 (Del.App. 1949):

"It is apparent from these provisions that no order changing the rates can be made by the Public Service Commission on its own initiative without a 'hearing concerning the lawfulness of such rate or rates' and without reasonable notice to the public as well as to the public utility affected. [Cite omitted.] When the act is read as a whole it is evident that the phrase in Section 5 which permits changes in rates by the Commission without the usual thirty days' notice 'under such conditions as it may prescribe' is not inconsistent with this conclusion. . . ."

We conclude, therefore, that the public is entitled to notice of the filing of Company's rate applications and hearings thereon.

2.  Notice of the Supportive Evidence Data.

The next issue presented is whether the public is entitled to notice of the evidence filed in support of a rate increase application. Company argues that there is no statutory requirement that the evidence to support an application be submitted in advance and that Rule 15.1(f) simply requires that a financial statement for a full 12-month period, including a balance sheet and profit and loss statement, be attached as an exhibit. We find that Rule 15.1 requires substantially more than a balance sheet and profit and loss statement.[4] Rule 15.1(c) requires

---

[4]Rule 15.1 in its entirety reads as follows:

"Application by any public utility other than rail or motor common carriers proposing to increase any rate, fare, toll, rental or charge or any classification, contract practice, rule or regulation resulting in any increase shall in addition to complying with the provisions of the rules applicable to all pleadings submit the following data, either in the application or attached thereto as an exhibit:

"(a) Statements showing in full the rates, tolls, rentals or charges or rules or regulations for which it is desired to put into effect or the general relief asked for.

"(b) A statement or reference showing in full the rates, bills, rental, charges or rules or regulations which will be superseded by the proposed rates.

"(c) *A complete and accurate statement of the circumstances and conditions relied upon as justification for the application.* [Emphasis added.]

that a utility rate application contain "[a] complete and accurate statement of the circumstances and conditions relied upon as justification for the application." The clear intent of this rule is to provide notice to Commission, its staff, and the public (Rule 15.2) of what the utility intends to rely upon to support a rate application. It is designed to enable Commission and any other interested parties to narrow their investigation concerning the "propriety" (NRS 704.110) of a particular rate increase to the elements enumerated by the utility in its rate application.

Company filed Docket Nos. 810, 811, 823, 824, 826, and 827 between September 12, 1973, and November 7, 1973. These rate applications as filed with the Commission all used a test year ending May 31, 1973, and related principally to the increased costs of fuel and common equity. These applications were noticed to the public, consolidated for hearing purposes, and the hearing set for December 4, 1973. Just before the hearing, on or about November 30, 1973, Company submitted its prepared testimony and exhibits to the then parties of record. From these documents, it was apparent that Company was requesting a rate increase based not only upon the evidence and data set forth in its filed applications but also upon additional cost and rate base factors that were not submitted with the filed applications. Additionally, such new cost factors were based on an updated test year ending September 30, 1973. Company, at the hearing, not only changed the test year from that which it had originally included in its applications, but it also presented other evidence relating to cost factors. Commission ruled that the new evidence, insofar as it was different from that originally referred to in Company's applications, could not be considered, because such consideration could result in a rate change and therefore not be in compliance with the 30 days' notice required by NRS 704.100(1). Additionally, Commission determined that consideration of such new and different costs would deny the public and other interested parties of their right to notice of what Commission was considering in a rate application, thereby depriving the public and such interested parties, as well as Commission and

"(d) A reference record to prior action if any by the Commission in any proceeding relative to the existing and proposed rates.

"(e) The approximate number of customers in each rate category or classification.

"(f) A financial statement for a full twelve (12) month period including a balance sheet, and profits and loss statement."

its staff, reasonable notice upon which to determine the propriety of the rate increase pursuant to NRS 704.110(1).

In urging that Commission erred in not considering the new evidence at the rate hearing, Company relies heavily upon Bell Tel. Co. v. Public Serv. Comm'n, 70 Nev. 25, 253 P.2d 602 (1953). This court said, 70 Nev. at 39, 253 P.2d at 608:

". . . When the case was being tried to the court on October 15, 1951 and the parties were considering the test period of the first seven months of 1951, it definitely appeared that the fifth round wage increase had started July 29, 1951. Only two days remained within the test period. The company had contracts with six different unions. These contracts provided a fixed wage schedule, with a starting rate and defined "step-ups." Knowing the number of employees of each class and on each "step" of the schedule, it was simply a matter of arithmetic to permit the submission of an exhibit which showed an annual increase in operating expense, though not within the test period, of $166,000 before federal income taxes. A similar situation existed with respect to federal income taxes. A bill was pending before the congress to increase this tax to 52% of net income, retroactive to April 1, 1951. There was little doubt but that it would pass and it subsequently did pass. This situation could not be ignored. Without an honest and intelligent forecast as to probable tax, price and wage levels in the immediate future the fixing of rates would be a futility. [Cites omitted.]"

This is not the situation in the instant case. The seven consolidated applications used a test year ending May 31, 1973. There was nothing contained therein that would suggest to Commission or the public that the applications were going to be supported with evidence of a different test year. The court in Bell did not hold or discuss whether Commission was required to consider an updated test year where that test year is different from that presented in an original application for a rate increase.

Other jurisdictions have held that it is beyond the jurisdiction of a regulatory body to make a determination on matters not noticed to the public. In the case of Re Citizens Util. Co., 19 PUR 3d 177 (1957), the California Utilities Commission stated, at 178:

"At the hearing in North Sacramento, applicant attempted orally to make a second amendment to its application concerning such district by which it sought approval of a rate schedule higher than that theretofore proposed. Primarily because

824

acceptance of such an oral amendment would be tantamount to a denial of due notice to the public, applicant was directed to prepare and file a 'Second Amendment to Application' concerning its new proposal . . ."

In Re Consolidated Edison Co., 90 PUR 3d 371, 384 (1971), the New York Commission stated:

"To avoid such a potential problem in the future, utilities seeking to justify an amount in addition to their intended rate filing that would separately be a major change should provide notice to the public of such an intention prior to the time the pertinent evidence is presented."

In a somewhat different context from that presented in the instant case, the Montana Commission, in Re Montana-Dakota Util. Co., 78 PUR (n.s.) 33, 45 (1949), stated:

"The company has one live-steam customer who receives service in Miles City . . . Rates on this service were fixed in 1927, but the company, apparently through inadvertence, failed to apply for increases in these rates. On the last day of the hearing, a schedule was filed covering these rates. This matter was not included in the notice of hearing and the Commission does not now have jurisdiction to consider this increase in live-steam rates."

Although the above-referenced regulatory decisions do not have the weight of prior judicial determinations, such cases do indicate the reasonableness of Commission's action taken in the instant case and that Commission did not act arbitrarily and capriciously.

The Supreme Court of the United States has ruled that, where a statute provides for a hearing, it means a meaningful hearing. A hearing is not meaningful without an awareness of the matters to be considered. The High Court held in Gonzales v. United States, 348 U.S. 407, 415 (1955): ". . . [T]he right to a hearing means the right to a meaningful hearing. *United States* v. *Nugent,* [346 U.S. 1 (1953)], *Simmons* v. *United States,* [348 U.S. 397 (1955)], . . . one based on all the facts in the file and made with awareness of the recommendations and arguments to be countered." And again the Court ruled, at 416, in quoting from Judge Learned Hand:

" 'As the case comes to us, the board made use of evidence of which [the registrant] may have been unaware, and which he had no chance to answer: a prime requirement of any fair hearing.' [Cite omitted.]"

We conclude, as did the district court, that Commission did not act arbitrarily or capriciously in refusing to consider the

new cost items set forth in Company's test year ending September 30, 1973.

3. The Rate of Return.

We turn to the remaining issue, and that is whether Commission acted arbitrarily in fixing a 12.75% rate of return on Company's common equity. The price/earnings ratio of a stock is simply the amount of earnings or yield that an investor may obtain by purchasing a share of stock at a given price.

The legislative mandate to Commission in the State of Nevada is that Commission establish rates that are "just and reasonable." NRS 704.040, 704.120. The concept of "just and reasonable" rates is discussed in two landmark cases of the United States Supreme Court.

In Bluefield Waterworks & Improvement Co. v. West Va. Pub. Serv. Comm'n, 262 U.S. 679 (1923), the Supreme Court stated, at 692–693:

"A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties."

Later, in Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 603 (1944), the Supreme Court reiterated Bluefield to some extent, and stated:

"By that standard the return to the equity owner should be commensurate with returns in investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital."

The return of the equity owner should be (a) commensurate with returns on investments in other enterprises having corresponding risks and (b) sufficient to assure confidence in the financial integrity of the enterprise so as to maintain its credit and to attract capital. The crux to every rate case involving the cost of common equity is just how one goes about conforming to the Bluefield and Hope cases.

In the proceedings before Commission in this case, Company presented the testimony of two witnesses, Messrs. Allen and Phelps, regarding a just and reasonable rate of return on Company's common equity. These two witnesses relied on the so-called earnings/price ratio approach and arrived at the conclusion that the equity return should be 17.4%. Two other witnesses, Messrs. Seeds and Loconto, also testified regarding the required return on Company's common equity. Mr. Seeds, essentially using the comparative-earnings approach, arrived at a recommended return of 12.31%. Mr. Loconto, using primarily the discounted-cash-flow technique, with a look at comparative earnings, arrived at a recommended return on common equity of between 12% and 13%. On the basis of the testimony of these witnesses, Commission arrived at a return on common equity of 12.75%.

Company complains that Commission rejected the evidence of the earnings/price ratio approach. However, the testimony and exhibits of Allen and Phelps were received into evidence and were before Commission. Commission determined that exclusive reliance on the earnings/price ratio approach was not a "viable regulatory test." Commission then went on to say, however, that "[a]lthough this Commission cannot and does not herein disregard the market price of applicant's common stock, we do not believe our decisions should be tied to the stock market." Commission did consider and weigh the earnings/price data.

Courts have been loath to prescribe the formula or formulae that must be used by a regulatory commission in establishing just and reasonable rates. The methods used by a regulatory body in establishing just and reasonable rates of return are generally considered to be outside the scope of judicial inquiry. Federal Power Comm'n v. Hope Natural Gas Co., *supra;* Federal Power Comm'n v. Natural Gas Pipeline Co., 315 U.S. 575 (1942); Kansas State Corp. Comm'n v. Federal Power Comm'n, 206 F.2d 690 (8th Cir. 1953). Indeed, this court has stated:

". . . Yet it is not our province to quarrel with methods used by the commission or with methods approved by the district court, no matter how faulty they may have been as means or guides in arriving at sundry determinations involved either in evaluating the property or determining the net return if the end result of the orders made is to permit the company a just and reasonable return. . . ." Bell Tel. Co. v. Public Serv. Comm'n, *supra,* 70 Nev. at 34, 253 P.2d at 606.

The hesitancy of courts to establish or prescribe formulae to be used by a regulatory body in determining reasonable rates of return stems from the fact that rate making is primarily a legislative function, and therefore, were the courts to prescribe such formulae, they would be exercising a legislative function not constitutionally entrusted to them.

We conclude, as did the district court, that Commission, acting on the record then before it, did not act arbitrarily or capriciously in fixing a 12.75% return on the common equity of Company.[5] We therefore affirm the order of the district court.

GUNDERSON, C. J., and BATJER and THOMPSON, JJ., and GUINAN, D. J., concur.

---

[5]It should be noted that Commission, acting on a subsequent application, filed an order on November 11, 1974, authorizing Company a 13.75% rate of return on its common equity.