138 Nev., Advance Opinion 5

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| SOUTHWEST GAS CORPORATION, Appellant, vs. PUBLIC UTILITIES COMMISSION OF NEVADA; AND STATE OF NEVADA, BUREAU OF CONSUMER PROTECTION, Respondents. | No. 80911 |

**FILED**

FEB 17 2022

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
DEPUTY CLERK

Appeal from a district court order denying a petition for judicial review in a public utilities general rate case. Eighth Judicial District Court, Clark County; William D. Kephart, Judge.

*Affirmed.*

Lewis Roca Rothgerber Christie LLP and Daniel F. Polsenberg, Joel D. Henriod, and Abraham G. Smith, Las Vegas,
for Appellant Southwest Gas Corporation.

Aaron D. Ford, Attorney General, and Whitney F. Digesti, Ernest D. Figueroa, Mark J. Krueger, and Michelle C. Newman, Deputy Attorneys General, Carson City,
for Respondent State of Nevada, Bureau of Consumer Protection.

Public Utilities Commission of Nevada and Matthew S. Fox and Garrett C. Weir, Carson City,
for Respondent Public Utilities Commission of Nevada.

Holland & Hart LLP and Laura K. Granier and Erica K. Nannini, Reno,
for Amicus Curiae Nevada Resort Association.

22-05253

BEFORE THE SUPREME COURT, EN BANC.

*OPINION*

By the Court, STIGLICH, J.:

Private entities operate Nevada's public utilities, but a public commission sets the maximum rates they can charge for their retail services, subject to judicial review. Here, a utility provider attempted to recover its expenses and sought an increased rate of return on equity (ROE), but the commission questioned several seemingly inappropriate charges for which the utility requested compensation. The commission determined that the utility did not justify the expenses it sought to recover, and as a result, the commission denied the utility's request for reimbursement and set a return on equity lower than what the utility had requested. The utility challenges the commission's determination and rate setting, contending that it enjoys a presumption of prudence with the expenses it submits to the commission and that the commission's rate setting did not adhere to due process requirements.

In this appeal, we hold that utilities do not enjoy a presumption of prudence with respect to the expenses they incur; rather, the utility must show that the expenses were prudently incurred. Next, we decline to adopt the constitutional-fact doctrine, which would require this court to review agency decisions de novo when a regulated party's constitutional rights are implicated. Thereafter, we determine that the commission's rate-setting procedures met due process requirements and that the ROE the PUC selected was not a confiscatory taking. Finally, we conclude that the commission's decision to disallow the utility to recover certain project expenses and additional pension expenses is supported by substantial

SUPREME COURT
OF
NEVADA

(O) 1947A

evidence in the record. Since we hold that the commission's decision was neither clearly erroneous nor constitutionally infirm, we affirm the district court order denying judicial review.

## BACKGROUND

Southwest Gas Corporation (SWG) provides natural gas to customers in Nevada. It is regulated by the Public Utilities Commission of Nevada (PUC). In May 2018, SWG filed a general rate application with the PUC, seeking to increase the service rates it charges to customers. In its application, SWG sought a rate that would allow it to recover, among other things, the costs of five software upgrade projects, adjusted pension expenses, and a 10.30% ROE.

With respect to the projects, the PUC Regulatory Operations Staff found numerous issues. Staff determined SWG's documentation demonstrated a lack of proper financial oversight. Among the many questionable expenses SWG submitted were items and services including: tens of thousands of dollars in consultant costs, airfare, lodging, car rentals, non-travel meals and entertainment, seminar fees, vouchers for biweekly massages, bartender costs, Apple Mac computers and multiple Apple iPads, a golf course membership, a home theater system, a digital piano, headphones, dozens of polo shirts, and a gas grill—all of which Staff determined were not adequately explained by SWG. Staff asserted that the audit led them to "question the reasonableness of all of the costs" associated with the projects, and as a result, Staff recommended that the PUC disallow 50% of the total project costs.

SWG filed the direct testimony of SWG Regulatory Professional Randi Cunningham in support of these projects, which included an exhibit that provided a brief summary of each work order and its total cost, but did not break down the costs within each work order. SWG also presented

rebuttal testimony of SWG Vice President of Information Services Ngoni Murandu. He testified that, while Staff accurately identified a small number of costs that should not have been included in the application, those errors did not rise to the level of an "extreme lack of oversight" that would justify disallowing half the costs of the projects. Mr. Murandu noted that the improper expenditures were removed and that SWG was no longer seeking recovery for them. He testified that the overall budget was reasonable based on independent estimates from PricewaterhouseCoopers (SWG's external accountant), a survey of industry peers, and responses to the company's Request for Proposals. Mr. Murandu contended that Staff's goal of "send[ing] a clear directive to SWG senior management" by recommending that the PUC disallow 50% of the project costs was inappropriately punitive.

As to pension expenses, SWG proposed a pension tracker to address the volatility in pension costs. A pension tracker is a ratemaking tool that tracks the gap between projected pension expenses included in rates and the expenses actually incurred by a utility provider. Christy Berger, an SWG Regulatory Professional, testified that pension costs had fluctuated substantially throughout the years based, in large part, on changes in the discount rate. The Bureau of Consumer Protection (BCP) raised concerns that a pension tracker would not incentivize SWG to control pension costs. Staff proposed a five-year normalization, or averaging of pension expenses, to address volatility.

SWG also proposed reducing the discount rate used to calculate the amount that it must now set aside to fund its future pension obligations from 4.50% to 3.75%. Between 2011 and 2017, SWG never used a discount rate lower than 4.25%. At the hearing, Ms. Berger was unable to explain

how SWG justified the decreased discount rate and stated that SWG could not produce any other witnesses who had such knowledge.

Additionally, regarding the ROE, or the percentage that utilities are permitted to earn on equity investments, SWG sought 10.30%, presenting two financial analysts to provide direct testimony in support of its proposition. Staff, on the other hand, presented an economist who recommended a lower ROE of 9.40%. BCP recommended an ROE of 9.30%. Overall, SWG recommended establishing an ROE within the range of 10.00% to 10.50%, Staff recommended a range of 9.10% to 9.70%, and BCP recommended a range of 9.00% to 9.50%.

The PUC made several determinations regarding SWG's application. First, the PUC ruled that SWG does not enjoy a presumption of prudence with respect to its expenditures. The PUC explained that under NAC 703.2331, the utility bears the burden of proof in demonstrating that its proposed rate changes are just and reasonable. It further explained that "[a] rate cannot be just or reasonable if it is established for the purpose of allowing the utility to recover costs that were not prudently incurred." Ultimately, the PUC found that SWG inadequately supported the prudence of its project expenses by failing to present capable witnesses in its affirmative case-in-chief, and thus the PUC disallowed 100% of the costs SWG submitted. The PUC stated that the only evidence supporting SWG's project expenses on direct testimony was testimony from Ms. Cunningham, who admitted that she had "no personal knowledge to support the underlying cost data."

Next, the PUC rejected SWG's proposed change in the pension discount rate, directing SWG to recalculate its pension costs consistent with the previous discount rate of 4.50%. The PUC further rejected SWG's

request to establish a tracking mechanism to address volatility, instead opting for the expense normalization procedure proposed by Staff, albeit with a three-year period instead of the recommended five-year period. Lastly, the PUC adopted the Staff recommendation of a zone of reasonableness for the ROE from 9.10% to 9.70%, settling on a rate of 9.25%.

SWG sought reconsideration of the ruling on the presumption of prudence and the findings regarding the project expenses, the pension expenses, and the ROE. The PUC affirmed its decisions, rejecting SWG's claim that it did not receive due process with respect to the pension expenses, since SWG had the opportunity to provide testimony from a capable witness on the pension costs and did not do so.

SWG thereafter petitioned the district court for judicial review. Its petition presented two overarching issues: (1) whether the presumption of prudence applies to utilities in rate cases and should be used to determine its recovery of project and pension expenses, and (2) whether the PUC denied SWG procedural due process by depriving it of notice and the opportunity to present evidence in opposition to the normalization of its pension expenses, by *sua sponte* asking questions about the discount rate, and by choosing an ROE lower than Staff or the BCP requested. SWG's petition stated that the district court should apply NRS 703.373(11)'s clearly erroneous standard of review. The district court affirmed the PUC's order. This appeal followed.

## DISCUSSION

*Standard of review*

On appeal from an order denying a petition for judicial review, this court will uphold the PUC's decision if it is supported by substantial evidence in the record and is not clearly erroneous, and we review pure legal issues de novo. NRS 703.373(11); *Nev. Power Co. v. Pub. Utils. Comm'n,*

122 Nev. 821, 834, 138 P.3d 486, 495 (2006). We do not "reweigh the evidence or substitute our judgment for that of the [PUC] on factual questions." *Nev. Power Co.*, 122 Nev. at 834, 138 P.3d at 495; *see also* NRS 703.373(11). When an agency's conclusions of law are "closely related to the agency's view of the facts, [they] are entitled to deference, and will not be disturbed if they are supported by substantial evidence." *Assoc. Risk Mgmt., Inc. v. Ibanez*, 136 Nev., Adv. Op. 91, 478 P.3d 372, 374 (2020); *see also Father & Sons & A Daughter Too v. Transp. Servs. Auth. of Nev.*, 124 Nev. 254, 259, 182 P.3d 100, 104 (2008). "The burden of proof is on the petitioner to show that the final decision is invalid pursuant to [NRS 703.373(11)]." NRS 703.373(9).

*Nevada does not recognize the constitutional-fact doctrine*

To ensure that the PUC's established rate is not unconstitutionally confiscatory, SWG asks this court to apply the constitutional-fact doctrine and review the PUC's factual determinations underlying its rate decision de novo. In *Ohio Valley Water Co. v. Borough of Ben Avon*, the United States Supreme Court held that a judicial tribunal must make its determination "upon its own independent judgment as to both law and facts" when a public utility claims a potential confiscation of its property through a regulatory agency's overly low property valuation, leading to an unreasonably small return. 253 U.S. 287, 289 (1920). The Court in *Ben Avon* ruled that de novo judicial review was required to comport with the Due Process Clause of the Fourteenth Amendment in such instances. *Id.*

While the Supreme Court has not expressly overruled *Ben Avon*, *Ben Avon* deviated from the Supreme Court practice at the time. *E.g.*, *S. Pac. Co. v. Campbell*, 230 U.S. 537, 552 (1913) (providing that a reviewing court should not "substitute its judgment for that of the commission, or

determine the matters which properly [fall] within the province of that body"). Similarly, since it decided *Ben Avon*, the Court has frequently deviated from the constitutional-fact doctrine and has deferred to agency determinations. *See,, e.g., Ala. Pub. Serv. Comm'n v. S. Ry. Co.*, 341 U.S. 341, 348 (1951) ("[I]t is now settled that a utility has no right to relitigate factual questions on the grounds that constitutional rights are involved."); *R.R. Comm'n of Tex. v. Rowan & Nichols Oil Co.*, 311 U.S. 570, 576 (1941) ("[T]he Due Process Clause does not require the feel of the expert to be supplanted by an independent view of judges on the conflicting testimony and prophecies and impressions of expert witnesses."). The Court clarified that "there is a strong presumption in favor of the conclusions reached by an experienced administrative body after a full hearing." *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 53 (1936) (quoting *Darnell v. Edwards*, 244 U.S. 564, 569 (1917)).[1]   Indeed, the constitutional-fact doctrine has "provoked much criticism, and it has largely faded from federal administrative litigation." 33 Charles Alan Wright et al., *Federal Practice & Procedure* § 8439 (2d ed. 2018) (footnote omitted); *see also* Adam Hoffman, *Corralling Constitutional Fact: De Novo Fact Review in the Federal Appellate Courts*, 50 Duke L.J. 1427, 1449 (2001) ("[J]urisdictional fact review [has] disappeared from American administrative law."). Other state courts have declined to apply *Ben Avon* to prevent their courts from being "overburdened with parallel determination of disputes already decided by agencies of tested proficiency in the administrative field." *N.Y. Tel. Co. v.*

---

[1]*St. Joseph Stock Yards* noted, however, that this presumption runs aground and the reviewing court may exercise independent review where the "evidence clearly establishes that the findings are wrong." 298 U.S. at 52.

*Pub. Serv. Comm'n*, 320 N.Y.S.2d 280, 286 (App. Div. 1971); *accord Haynes Pines Water Co. v. Idaho Pub. Utils. Comm'n*, 834 P.2d 873, 876 (Idaho 1992); *Pub. Serv. Comm'n v. Gen. Tel. Co. of the Se.*, 555 S.W.2d 395, 402 (Tenn. 1977).

Consistent with our jurisprudence, we, too, decline to apply the constitutional-fact doctrine, as sought in this case. *See, e.g., Nev. Power Co.*, 122 Nev. at 834, 138 P.3d at 495 (applying a deferential standard of review to factual determinations in a PUC decision); *Nev. Power Co. v. Pub. Serv. Comm'n*, 91 Nev. 816, 818, 544 P.2d 428, 430 (1975) (same); *Sw. Gas Corp. v. Pub. Serv. Comm'n*, 86 Nev. 662, 667, 474 P.2d 379, 382 (1970) (same). Indeed, we have already declined to "enlarge the scope of judicial review" to conduct de novo review of agency action where a party alleges a confiscation of its property. *Urban Renewal Agency v. Iacometti*, 79 Nev. 113, 120, 379 P.2d 466, 469 (1963) ("Involvement of the power of eminent domain does not, as respondents contend, serve to enlarge the scope of judicial review of action by a governmental body . . . .").

A deferential standard of review is particularly important in a ratemaking case. Determining rates is arguably a unique decision that does not fall neatly into traditional categories of findings of fact, conclusions of law, or even mixed questions of law and fact. Rather, within broad constitutional limits, "[t]he methods used by a regulatory body in establishing just and reasonable rates of return are generally considered to be outside the scope of judicial inquiry." *Nev. Power Co.*, 91 Nev. at 826, 544 P.2d at 435; *cf. Duquesne Light Co. v. Barasch*, 488 U.S. 299, 313 (1989) (stating that a utilities commission is "essentially an administrative arm of the legislature"). And even where a court can disentangle salient facts from the PUC's order, it is ill-equipped to handle the complex financial analysis

SUPREME COURT
OF
NEVADA

(O) 1947A

9

therein. *See generally Duquesne Light*, 488 U.S. at 314 ("The economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result."). Put simply, the PUC has expertise to adjudicate ratemaking cases that the judiciary—both district courts and this court—lacks.

Therefore, we decline to disturb our well-settled standards governing judicial review of agency action to apply a doctrine that deviated from existing Supreme Court jurisprudence when it was promulgated, has been squarely contradicted by later cases, and has faded from use in administrative litigation. We thus move on to review SWG's merits arguments.

*The PUC's order is valid as to its project and pension determinations*

*SWG was not entitled to a rebuttable presumption of prudence*

Next, SWG argues that the PUC erred by failing to apply a rebuttable, burden-shifting "presumption of prudence" with respect to its project and pension expenses, pursuant to *Nevada Power Co.*, 122 Nev. at 834-36, 138 P.3d at 495-96, and *Public Service Commission v. Ely Light & Power Co.*, 80 Nev. 312, 393 P.2d 305 (1964).

*Nevada Power Co.* concerned a deferred energy accounting case, in which the PUC can adjust a utility's rates on the narrow basis of changes in the wholesale prices the utility pays. *See id.* at 824-25, 138 P.3d at 488. In 1999, Nevada Power entered into negotiations to purchase wholesale electricity at prices well below market rates, but the negotiations failed due to a disagreement in price terms. *Id.* at 827, 138 P.3d at 490-91. Nevada Power's subsequent energy purchases from a different provider left it with excess off-peak power. *Id.* at 829, 138 P.3d at 491. Instead of promptly selling the excess power, Nevada Power held onto it for almost a year, at which point the resale value had greatly decreased. *Id.* It later sought to

recover these costs from consumers. *Id.* at 826, 138 P.3d at 490. The PUC found that Nevada Power's aforementioned decisions were imprudent and disallowed recovery of $437 million in expenses. *Id.* at 826-27, 138 P.3d at 490.

This court reversed the PUC's order, holding that "a utility requesting a customer rate increase enjoys a presumption that the expenses reflected in its deferred energy application were prudently incurred and taken in good faith." *Id.* at 834-35, 138 P.3d at 495. It explained that the party challenging an expenditure must overcome the presumption of prudence with evidence showing "a serious doubt" regarding the prudence of the utility's expense. *Id.* at 835, 138 P.3d at 495-96. After the presumption has been overcome, the utility must present evidence showing that the expenditure was prudent. *Id.* at 835, 138 P.3d at 496. This court drew this framework from *Re Nevada Power Co.*, 74 P.U.R.4th 703 (Nev. P.S.C. 1986), an earlier PUC opinion that adopted the presumption of prudence utilized by the Federal Energy Regulatory Commission (FERC). *Id.* at 834-35, 138 P.3d at 495-96; *see also Re Midwestern Gas Transmission Co.*, 64 P.U.R.4th 508, 510 (F.E.R.C. 1985); *Re Minn. Power & Light Co.*, 11 FERC ¶ 61312, 61645 (F.E.R.C. 1980).

We determine that SWG's contention that *Nevada Power Co.* provides that it enjoys a presumption of prudence in this context fails. *Nevada Power Co.* applied the presumption of prudence to a deferred energy accounting case, as distinguished from the general rate case at issue here.[2]

---

[2]In a deferred energy accounting case, the PUC can adjust a utility's rates on the narrow basis of changes in the wholesale prices the utility pays, without the detail and expense of a general rate case covering other types of expenditures. NRS 704.185; *Nev. Power Co.*, 122 Nev. at 824-25, 138 P.3d at 489.

*Nev. Power Co.*, 122 Nev. at 834-35, 138 P.3d at 495-96. Further, the Nevada Legislature subsequently and promptly abrogated *Nevada Power Co.*'s holding by statute, removing the presumption of prudence in deferred energy accounting cases entirely. *See* 2007 Nev. Stat., ch. 163, § 1(3), at 551 (A.B. 7).

Nor did *Ely Light* create or recognize such a presumption. There, this court found it was improper for the PUC to substitute its judgment for that of management as to how much should be paid in pensions. *See* 80 Nev. at 323, 393 P.2d at 311 (PUC noting that "[t]he plan, as explained by the Company, is an employee retirement program which costs approximately 15% of total wages paid. . . . [T]his Commission feels that for the Company to pay such a high cost for the plan is not in the best interest of the rate payers"). While *Ely Light* observed a "presumption of the proper exercise of judgment by the utility in matters which are particularly a function of management," it did not presume that a utility's expenses were prudently incurred. *Id.* at 324, 393 P.2d at 311. Rather, because the decision to have a pension plan was within the sound judgment of the utility, *Ely Light* held that the utilities commission should review the utility's pension expenditures to determine whether the utility abused its discretion; whether inefficiency, improvidence, or a lack of good faith have been shown; and whether the costs are reasonable. *Id.* Stated differently, *Ely Light* did not establish a presumption of prudence with respect to the specific pension expenses the utility incurred, but rather prohibited the PUC from second-guessing the utility's business decision to offer a pension plan at all. *Id.* Accordingly, *Ely Light* does not show that the presumption of prudence applies in Nevada.

In the absence of statutory authority or precedent, we decline to adopt a presumption of prudence in this case. The current regime, by which the utility must demonstrate the prudence of the expenses it seeks to recover, makes sense. The PUC protects Nevada ratepayers from paying for imprudently incurred expenses. *See* Olivia Chap, Note, *Cost-of-Service Ratemaking and Labor Costs: Expanding the "Just and Reasonable" Standard to Close the Gender Pay Gap in the Energy Industry*, 11 Geo. Wash. J. Energy & Envtl. L. 67, 72 (2021) ("One way to prevent public utilities from abusing their power and charging overpriced fees has been for PUCs to oversee the rates utilities charge for [the utilities'] service[s] . . . ." (internal footnotes omitted)). Indeed, utilities are granted monopolies over their services in exchange for this oversight. *See Topaz Mut. Co. v. Marsh*, 108 Nev. 845, 854, 839 P.2d 606, 611 (1992) ("Because utilities have a monopoly on a necessary service, they are regulated to protect the ratepayers, the public, and the parties who transact business with them."); Lina Khan, Note, *Amazon's Antitrust Paradox*, 126 Yale L.J. 710, 797 (2018) ("It was precisely because essential network industries often required scale that unregulated private control over [public utility] sectors often led to abuse of monopoly power."). The utility has the information necessary to display the prudence of its expenses; the current framework merely requires them to submit these records. Flipping the burden to intervenors or to the PUC to raise a "serious doubt" would be impracticable. An intervenor does not know what it cannot know, and a third party may not have the documents necessary to raise such doubt about the utility's expenditures. Imposing such a burden, even when an intervenor or the PUC could possibly obtain documentation sufficient to raise a "serious doubt," would lead to an unnecessary delay in the PUC's deliberations and makes little sense when

the utility could readily provide such documentation.[3] In other words, the utility is best positioned to prove the prudence of the expenses it incurs. And if the PUC rejects the utility's expenditures in an arbitrary and capricious manner that is not supported by substantial evidence in the record, the utility may petition the courts for review. NRS 703.373(11); *Nev. Power Co.*, 122 Nev. at 834, 138 P.3d at 495.[4] We therefore decline to adopt a presumption of prudence that would disturb the current regulatory regime.[5]

*PUC's rate-setting procedures conformed to due process requirements*

SWG contends that it was denied procedural due process because it was deprived of the opportunity to submit testimony or other evidence challenging the PUC's decision to normalize and reduce pension expenses. SWG also asserts that the PUC's decision to adopt a three-year normalization was arbitrarily designed to deprive it of recovery in a high-cost year. It further argues that the PUC violated due process by independently questioning SWG's proposed discount rate at the hearing,

---

[3]Time is of the essence in general rate cases. NRS 704.110(2) requires the PUC to adjudicate a general rate application within 210 days after the utility files its application.

[4]Placing the burden fully on the utility to demonstrate prudence is also consistent with existing regulations, which require the utility to "ensure that the material it relied upon is of such composition, scope and format that it would serve as its complete case if the matter is set for hearing." NAC 703.2231; *see also* NAC 703.2325 (providing that "adjustments [to the rate base] must be fully and clearly explained in the supporting material submitted" with the application).

[5]We decline to consider SWG's contention that a presumption of prudence is a constitutional requirement because it did not cogently argue this point or support it with salient authority. *See Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006).

selecting a zone of reasonableness from 9.10% to 9.70%, and choosing an ROE lower than either SWG, BCP, or Staff requested. We review these constitutional claims de novo. *Eureka County v. Seventh Judicial Dist. Court*, 134 Nev. 275, 279, 417 P.3d 1121, 1124 (2018).

Procedural due process "requires notice and an opportunity to be heard." *Callie v. Bowling*, 123 Nev. 181, 183, 160 P.3d 878, 879 (2007) (quoting *Maiola v. State*, 120 Nev. 671, 675, 99 P.3d 227, 229 (2004)). Notice must be provided at the appropriate stage so that parties can provide "meaningful input in the adjudication of their rights." *Eureka County*, 134 Nev. at 280, 417 P.3d at 1125.

The record is clear that SWG had notice and the opportunity to present its case on the normalization issue. This issue was raised in the prefiled direct testimony, and yet SWG did not sufficiently address it in either direct testimony or in rebuttal at the hearing. Put differently, SWG had notice that the PUC would consider normalization and was afforded the opportunity to argue against it at the hearing, but it did not avail itself of this opportunity. Nor did the PUC deprive SWG of the opportunity to explain its reduction in the discount rate. When Ms. Berger, the SWG Regulatory Professional, was asked at the hearing how SWG determined the discount rate, she merely stated that this decision was made in conjunction with an actuary, that she could not provide any further information on the discount rate, and that SWG had no other witnesses who could do so. Therefore, these due process claims fail because SWG was provided both "notice and an opportunity to be heard" with respect to both the normalization issue and the discount rate. *See Callie*, 123 Nev. at 183, 160 P.3d at 879.

It is also clear that the PUC's decision to adopt a three-year normalization was justified and neither arbitrary nor capricious. It makes sense that the PUC would adopt a normalization procedure for the first time in response to a significant fluctuation. The nature of averaging means that SWG will be somewhat undercompensated in high-cost years but correspondingly overcompensated in low-cost years, as long as the method is consistent. To be sure, if the PUC were to switch *back* to a one-year model in a subsequent rate case when costs are lower—thus denying recovery entirely for the high-cost years—then under *Duquesne Light*, the PUC's conduct might be arbitrary and capricious. *See* 488 U.S. at 315 ("[A] State's decision to arbitrarily switch back and forth between methodologies in a way which required investors to bear the risk of bad investments at some times while denying them the benefit of good investments at others would raise serious constitutional questions."). But the record before us evinces no such conduct from the PUC that would amount to a violation of SWG's constitutional rights.

Nor did the PUC err by independently inquiring about the proposed discount rate. The PUC is not restricted to considering only the issues presented by the parties. NRS 704.440, for example, empowers the PUC to "*investigate* and ascertain the value of all property of every public utility." (Emphasis added.) As the Supreme Court of New Jersey has explained, utility commissions have a "duty to go behind the figures shown by the companies' books and get at realities." *Petition of Pub. Serv. Coordinated Transp. v. State*, 74 A.2d 580, 591-92 (N.J. 1950). If neither Staff's recommendation nor the utility's recommendation is supported by the evidence, it would be error for the PUC to uncritically adopt either one. *See id.* Likewise, here, the PUC properly went beyond the parties' briefing

and asked clarifying questions about the discount rate—a change which SWG proposed but did not support with adequate witness testimony—and when SWG was unable to support the change in the rate, the PUC denied that change.

Similarly, SWG's claims regarding the ROE fails. In selecting a zone of reasonableness between 9.10% to 9.70%, the PUC considered, *inter alia*, the parties' expert testimony and SWG's circumstances, such as its capital structure and risk profile. Far from being arbitrary, therefore, the PUC's selected zone of reasonableness is supported by substantial evidence in the record. *See* NRS 703.373(11)(e); *see also Nev. Power Co.*, 122 Nev. at 834, 138 P.3d at 495 (noting that this court does not "reweigh the evidence or substitute our judgment for that of the [PUC] on factual questions"). Likewise, SWG's claim that the PUC's selection of an ROE was arbitrary and capricious falls short. The PUC was free to fix any ROE within the range of reasonableness and permissibly settled on a rate of 9.25% after balancing the interests of ratepayers and shareholders. *See Fed. Power Comm'n v. Nat. Gas Pipeline Co. of Am.*, 315 U.S. 575, 585-86 (1942) (establishing that a regulatory commission is free to fix a rate within the zone of reasonableness). We therefore conclude that SWG has not shown a procedural due process violation in this regard.[6]

*The rate of return was not a confiscatory taking*

We next consider SWG's contention that the PUC's selection of a 9.25% ROE amounted to an unconstitutional taking because the ROE was

---

[6]SWG contends that the PUC's selected range of reasonableness and ROE present takings claims because the PUC's decision-making was arbitrary and capricious. Since we reject that the PUC's selections were arbitrary and capricious here, we need not consider the same allegations when presented as takings claims.

not "equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings that are attended by corresponding risks and uncertainties." *Cf. Bluefield Waterworks & Imp. Co. v. Pub. Serv. Comm'n*, 262 U.S. 679, 692-93 (1923).[7]

"The Constitution protects the utility from the net effect of the rate order on its property" and not from procedural errors "compensated by countervailing factors in some other aspect." *Duquesne Light*, 488 U.S. at 314; *see Nat. Gas Pipeline Co.*, 315 U.S. at 586. In considering the net effect, the inquiry is "whether 'the return to the equity owner [is] commensurate with returns on investments in other enterprises having corresponding risks,' and whether the return was 'sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.'" *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 790-91 (1968) (quoting *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944)); *see also Bluefield*, 262 U.S. at 692 (1923) ("A public utility is entitled to such rates . . . equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding, risks and uncertainties.").

We determine that SWG's claim lacks merit. Consistent with the constitutional requirement that return be measured against returns on investment earned by "other enterprises having corresponding risks," the parties used an agreed-upon proxy group of other utilities to compare ROEs.

---

[7]To the extent that SWG contends that the PUC's denial of its project expenses was a confiscatory taking, we conclude that it did not appropriately develop this argument and therefore decline to consider it. *Edwards*, 122 Nev. at 330 n.38, 130 P.3d at 1288 n.38.

*See Hope Nat. Gas*, 320 U.S. at 603; *Bluefield*, 262 U.S. at 692.[8] The PUC determined that the evidence presented—for example, that SWG's credit rating had improved since its last general rate case—did not support a finding that SWG faces higher risks than the proxy group and that an ROE of 9.25% is sufficient to ensure SWG's ability to attract capital. We conclude that the PUC's determination is supported by substantial evidence in the record and defer to its judgment. *See* NRS 703.373(11)(e); *Nev. Power Co.*, 122 Nev. at 834, 138 P.3d at 495. Since the PUC's findings demonstrate that the 9.25% ROE is commensurate with other utilities with corresponding risks and maintains SWG's ability to attract capital, we conclude that the ROE was not an unconstitutional taking. *Cf. Permian Basin*, 390 U.S. at 790-91.

> *The PUC's decision to disallow SWG to recover its project and pension expenses is supported by substantial evidence in the record*

Having declined to adopt a presumption of prudence and having established the constitutionality of the PUC's rate-setting, we next consider whether the PUC's decision to disallow SWG to recover its project and pension expenses is supported by substantial evidence in the record.

Here, Staff showed, and SWG conceded, that at least some of the expenses in the challenged work orders should not have been included. SWG submitted scant evidence substantiating the projects' work order expenses in its case-in-chief. On direct testimony, SWG presented the testimony of Ms. Cunningham, who the PUC determined possessed no "personal knowledge to support the underlying cost data of any of the itemized work order projects included in her testimony." SWG also provided

---

[8]In fact, SWG selected the proxy group, which the BCP and Staff thereafter utilized in their models and analyses.

the rebuttal testimony of Mr. Murandu, which the PUC gave minimal weight because he was not employed by SWG until after the projects were closed.[9] The PUC determined that SWG presented no witnesses who were directly involved in the execution of the projects or who could explain the company's basis for incurring costs. As noted above, the PUC was not bound to allow for 50% of the project expenses (Staff's recommendation) or 100% (SWG's request), and so the PUC was within its discretion to deduct all of the submitted project expenses. *See Petition of Pub. Serv. Coordinated Transp.*, 74 A.2d at 591-92.

Nor did SWG provide evidence to support its significant proposed change to the discount rate. As noted above, Ms. Berger acknowledged at the hearing that SWG had not used a discount rate lower than 4.25% between 2012 and 2017, and that SWG reduced the rate from 4.50% to 3.75% in 2018. However, she was unable to explain how SWG made the decision to significantly reduce the discount rate, and SWG did not present any other witnesses who could justify such reduction.

We will not overturn the PUC's factual conclusions unless they are clearly erroneous. *See* NRS 703.373(11)(e); *see also Nev. Power Co.*, 122 Nev. at 834, 138 P.3d at 495 ("[W]e will uphold a PUCN decision that is . . . based on substantial evidence."). SWG has not shown that the PUC's

---

[9]The PUC initially stated that they would disregard Mr. Murandu's testimony because of his lack of personal knowledge. However, the record reflects that the PUC ultimately considered the testimony, although it afforded it minimal weight. As discussed below, a utility is not limited to providing testimony from witnesses involved in the relevant projects because employees may obtain personal knowledge by other means. *See Wash. Cent. R.R. Co., Inc. v. Nat'l Mediation Bd.*, 830 F. Supp. 1343, 1353 (E.D. Wash. 1993) (concluding that personal knowledge can be inferred from a witness's review of files and records).

disallowance of recovery for the project expenses and its rejection of SWG's preferred discount rate are clearly erroneous or unsupported by substantial evidence. *See* NRS 703.373(9). While a utility need not solely present the testimony of employees involved in the projects for which it seeks reimbursement, it must affirmatively display the prudence of its expenses in its case-in-chief. The PUC's skepticism of SWG's expenses was warranted in light of SWG's earlier attempt to obtain reimbursement for a number of questionable expenses, including biweekly massages and a home theater system, and the utility's lack of justification for its other expenses in its case-in-chief. This court will not substitute its judgment for that of the PUC on the weight of the evidence. NRS 703.373(11). Therefore, we determine that SWG did not show that the PUC improperly denied recovery for its project expenses or the change in the discount rate.

## CONCLUSION

Utilities are granted monopolies to provide their services to Nevadans. In return, the PUC determines the maximum rate utilities can charge for their services, subject to judicial review. In this case, we hold that utilities do not enjoy a presumption of prudence with respect to the expenses they submit to the PUC. Additionally, we decline to adopt the constitutional-fact doctrine, and we apply the substantial evidence standard when reviewing PUC decisions.

Next, we hold that the PUC's rate-setting procedures comported with procedural due process requirements. Furthermore, we conclude that the PUC's selected ROE was not an unconstitutional taking. Lastly, we apply the substantial evidence standard and determine that SWG did not demonstrate the prudence of its pension expenses or its proposed change to

the discount rate. Therefore, we affirm the district court's order denying SWG's petition for judicial review and affirming the PUC's decision.

_____, J.
Stiglich

We concur:

_____, C.J.
Parraguirre

_____, J.
Cadish

_____, J.
Pickering

_____, J.
Hardesty

_____, J.
Silver

_____, J.
Herndon

SUPREME COURT
OF
NEVADA

(O) 1947A

22